JS 44 (Rev 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

RACHELLE DRISCOLL

**DEFENDANTS**

QURATE RETAIL, INC.,
QVC, Inc.

**(b)** County of Residence of First Listed Plaintiff  New Hanover County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  Arapahoe County
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Katherine C. Oeltjen Esq., Console Mattiacci Law,
1525 Locust Street, 9th Fl., Philadelphia, PA 19102 215-545-7676

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1  U S Government Plaintiff | ☒ 3  Federal Question *(U.S. Government Not a Party)* |
| ☐ 2  U S Government Defendant | ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 880 Defend Trade Secrets | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | Act of 2016 | (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | **SOCIAL SECURITY** | Protection Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| | Medical Malpractice | | Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☒ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 870 Taxes (U S Plaintiff | Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | or Defendant) | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party | ☐ 899 Administrative Procedure |
| ☐ 290 All Other Real Property | ☐ 445 Amer w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | 26 USC 7609 | Act/Review or Appeal of |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | Agency Decision |
| | ☐ 446 Amer w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | ☐ 950 Constitutionality of |
| | Other | ☐ 550 Civil Rights | Actions | | State Statutes |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. §12101, et seq.; 29 U.S.C. §2601, et seq.
Brief description of cause:
Plaintiff was discriminated and retaliated against based on her disability

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $
in excess of $75,000

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____  DOCKET NUMBER _____

DATE
09/03/2021

SIGNATURE OF ATTORNEY OF RECORD
/s/ Katherine C. Oeltjen

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG JUDGE _____

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

  **(b)**   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

  **(c)**   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**.** (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.**   **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**   **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**   **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.**   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

| | | |
|---|---|---|
| RACHELLE DRISCOLL | : | CIVIL ACTION |
| | : | |
| v. | : | |
| QURATE RETAIL, INC., and | : | |
| QVC, INC., | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.          ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.          ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.          ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court.  (See reverse side of this form for a detailed explanation of special
    management cases.)          ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.          (X)

| | | |
|---|---|---|
| 9/3/2021 | /s/ Katherine C. Oeltjen | Plaintiff, Rachelle Driscoll |
| **Date** | **Attorney-at-law** | **Attorney for** |
| (215) 545-7676 | 215-565-2859 | oeltjen@consolelaw.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**

*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____ Wilmington, NC _____

Address of Defendant: 12300 Liberty Boulevard Englewood, Colorado 80112 .

Place of Accident, Incident or Transaction: _____ 1200 Wilson Drive, West Chester, PA 19380 _____

---

**RELATED CASE, IF ANY:**

Case Number: _____ Judge: _____ Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?  Yes ☐  No ☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?  Yes ☐  No ☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?  Yes ☐  No ☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?  Yes ☐  No ☑

I certify that, to my knowledge, the within case ☐ is / ☑ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 09/03/2021 _____ /s/ Katherine C. Oeltjen _____ 318037 _____

        *Attorney-at-Law / Pro Se Plaintiff*        *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.**   *Federal Question Cases:*

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Patent
- ☐ 6. Labor-Management Relations
- ☑ 7. Civil Rights
- ☐ 8. Habeas Corpus
- ☐ 9. Securities Act(s) Cases
- ☐ 10. Social Security Review Cases
- ☐ 11. All other Federal Question Cases
  *(Please specify)* _____

**B.**   *Diversity Jurisdiction Cases:*

- ☐ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury *(Please specify)* _____
- ☐ 7. Products Liability
- ☐ 8. Products Liability – Asbestos
- ☐ 9. All other Diversity Cases
  *(Please specify)* _____

---

**ARBITRATION CERTIFICATION**

*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, Katherine C. Oeltjen, Esquire , counsel of record *or* pro se plaintiff, do hereby certify:

- ☑ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

- ☐ Relief other than monetary damages is sought.

DATE: 09/03/2021 _____ /s/ Katherine C. Oeltjen _____ 318037 _____

        *Attorney-at-Law / Pro Se Plaintiff*        *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **RACHELLE DRISCOLL,** <br> **Wilmington, North Carolina 28412** | **CIVIL ACTION NO.** |
| **Plaintiff,** <br> **v.** | |
| **QURATE RETAIL, INC.,** <br> **12300 Liberty Boulevard** <br> **Englewood, Colorado 80112** | **JURY TRIAL DEMANDED** |
| **and** | |
| **QVC, INC.,** <br> **1200 Wilson Drive** <br> **West Chester, Pennsylvania 19380** | |
| **Defendants.** | |

## **COMPLAINT**

### I.   INTRODUCTION

Plaintiff, Rachelle Driscoll ("Plaintiff"), an experienced television professional who suffers from the inflammatory disease and disability of Endometriosis, was terminated by Defendants, Qurate Retail, Inc. and QVC, Inc. (collectively "Defendants"), because of her Endometriosis and shortly after she sought medical treatment and required medical leave. Prior to notifying Defendants that she required medical leave and treatment for her disability, Plaintiff had never been told that her position as an on-air, Program Host was in jeopardy. In fact, Plaintiff had been selected to serve as a Program Host by Defendants after a highly competitive selection process and successful completion of a training, or "probationary," period. Yet, when Plaintiff disclosed her need for treatment, Defendants took steps to minimize her visibility by

1

assigning her less on-air time or by assigning her to on-air hours with minimal viewers, subjecting her to unwarranted criticism, and ultimately terminating her employment. Defendants retained Program Hosts who performed in a lesser or similar manner than Plaintiff but who had not disclosed disabilities or required medical leave. Plaintiff now brings claims pursuant to the Americans with Disabilities Act, as amended, 42 U.S.C. §12101, *et seq.* ("ADA"), the Family Medical Leave Act, 29 U.S.C. §2601, *et seq.* ("FMLA"), the Pennsylvania Human Relations Act, as amended, 43 P.S. § 951, *et seq.* ("PHRA"), and the Philadelphia Fair Practices Ordinance, Phila. Code § 9-1101, *et seq.* ("PFPO").

## II.   PARTIES

1.     Plaintiff is an individual and citizen of North Carolina. She resides in Wilmington, North Carolina.

2.     Defendant Qurate Retail, Inc. is a Delaware corporation with a principal place of business located at 12300 Liberty Boulevard, Englewood, Colorado 80112.

3.     Defendant QVC, Inc. is a wholly owned, consolidated subsidiary of Defendant Qurate Retail, Inc.

4.     Defendant QVC, Inc. is a Delaware corporation with a principal place of business located at 1200 Wilson Drive, West Chester, PA 19380.

5.     Defendants are engaged in an industry affecting interstate commerce and regularly do business in the Commonwealth of Pennsylvania, including without limitation, within and throughout the City of Philadelphia.

6.     At all times material hereto, Plaintiff worked for Defendants out of the West Chester office.

7.     At all times material hereto, Defendants employed more than fifty (50) employees within a seventy-five (75) mile radius of Plaintiff's work location.

8.     At all times material hereto, Defendants acted by and through their authorized agents, servants, workmen, and/or employees acting within the course and scope of their employment with Defendants and in furtherance of Defendants' business.

9.     At all times material hereto, Defendants were employers within the meaning of the statutes which form the basis of this matter.

10.    At all times material hereto, Plaintiff was an employee of Defendants within the meaning of the statutes that form the basis of this matter.

III.    JURISDICTION AND VENUE

11.    The causes of action which form the basis of this matter arise under the ADA, the FMLA, the PHRA, and the PFPO.

12.    The District Court has jurisdiction over Count I (ADA) and Count II (FMLA) pursuant to 42 U.S.C. §12117(a) and 28 U.S.C. §1331.

13.    The District Court has jurisdiction over all Counts pursuant to 28 U.S.C. §1332 since the amount in controversy exceeds the sum or value of seventy-five thousand dollars ($75,000), exclusive of interests and costs, and as there is complete diversity of citizenship as Plaintiff is a citizen of North Carolina and Defendants are citizens of Colorado and Pennsylvania, respectively.

14.    Venue is proper in this District Court under 28 U.S.C. §1391(b) because a substantial part of the events giving rise to these claims occurred within this District.

15.    On or about April 7, 2020, Plaintiff filed a Complaint with the Pennsylvania Human Relations Commission ("PHRC") complaining of the acts of discrimination and

retaliation alleged herein. The Complaint was cross-filed with the Equal Employment Opportunity Commission ("EEOC"). Attached hereto, incorporated herein, and marked as Exhibit "1" is a true and correct copy of the PHRC Complaint (with personal identifying information redacted).

16.    On or about June 9, 2021, the EEOC issued the Plaintiff a Notice of Right to Sue for her Complaint. Attached hereto and marked as Exhibit "2" is a true and correct copy of the Notice (with personal identifying information redacted).

17.    Plaintiff has fully complied with all administrative prerequisites for the commencement of this action.

## IV.    FACTUAL ALLEGATIONS

18.    Plaintiff was hired by Defendants on or about September 4, 2018, as a Trainee Program Host for Defendants' QVC home shopping network and across QVC's other platforms.

19.    Plaintiff's hire followed a highly competitive application, audition, and interview process. Plaintiff was one of six (6) hosts selected to become Trainees out of approximately seventeen thousand (17,000) candidates.

20.    At all times material hereto, Plaintiff suffered from Endometriosis a chronic, inflammatory disease and disability.

21.     Endometriosis is a chronic medical condition in which tissue similar to that found in the lining of the uterus grows outside of the uterus. Endometriosis can result in a myriad of symptoms including without limitation, debilitating abdominal and leg pain, infertility, extreme fatigue, bowel and urinary disorders, and nausea and vomiting.

22.    To the best of her knowledge, Plaintiff was the only disabled Trainee Program Host out of the six (6) hired in Plaintiff's "class" of Trainee Program Hosts.

23.     Trainee and non-Trainee Program Hosts appear on camera during live programming and are responsible for informing the audience about the attributes and benefits of each product featured such that viewers are inspired to make purchases, and therefore generate revenue for Defendants.

24.     At all times material hereto, Plaintiff performed her job in an exemplary manner, consistently taking on job duties that were not required of her in order to ensure Defendants' success. By way of example, and without limitation, this included extensive work with Defendants' digital department(s) to coordinate a social media and digital strategy for the promotion of Defendants' products.

25.     As a Trainee Program Host, Plaintiff was given approximately six (6) months to perform as a Program Host to Defendants' satisfaction. Successful Trainees would be invited to remain as Program Hosts, without Trainee designation, for Defendants.

26.     Defendants tasked Mary Beth Roe ("Roe"), a senior QVC Program Host, with conducting part of Plaintiff's training.

27.     During Plaintiff's training, Plaintiff told Roe that she suffered from a medical condition/disability. Roe told Plaintiff that she should inform "management" of Defendants.

28.     Fearing that disclosing her disability would prevent Defendants from retaining her, Plaintiff did not disclose her medical condition at that time.

29.     Between September 2018 and February 2019, Plaintiff performed all aspects of the training program.

30.     On or about March 4, 2019, Plaintiff successfully completed her probationary period and became a Program Host without Trainee designation.

31.    At least one (1) of the six (6) Trainee Program Hosts hired at the same time as Plaintiff was not selected to remain as a Program Host.

32.    Plaintiff initially reported to Caroline Stueck ("Stueck"), non-disabled[1], Director of Talent.

33.    Approximately one month after becoming a non-Trainee Program Host, Plaintiff's supervisor changed to Beverly Brettmann ("Brettmann"), non-disabled, Director of Talent.

34.    Brettmann reported to Susan Schick ("Schick"), non-disabled, then Vice President of Talent.

35.    On or about April 2, 2019, Plaintiff told Shannon Mallon, ("Mallon"), Head of Programming, that she needed surgery for Endometriosis.

36.    Mallon reported to Mary Campbell ("Campbell"), then Chief Merchandising Officer and presently Chief Content, Digital and Platforms Officer for Defendant Qurate Retail, Inc.

37.    Brettmann also learned of Plaintiff's disability and need for surgery.

38.    After learning of her disability, Brettmann, for the first time, told Plaintiff "They" don't "get you." Plaintiff understood "They" to refer to upper management and those within Defendants' programming division.

39.    Plaintiff understood the statement to be negative as other hosts had been terminated or given poor on-air time slots when "They" "didn't get" them.

40.    Plaintiff had never been told that management "didn't get [her]" before she told Brettmann and Mallon that she needed surgery for her disability.

_____

[1] All allegations as to disability status, except for Plaintiff's own, are made to the best of Plaintiff's knowledge.

41.     On or about April 29, 2019, Plaintiff telephoned Team Member Services to get information about medical leave for surgery. Team Member Services opened a "case" on Plaintiff's behalf and provided her with information about medical leave.

42.     Initially, upon becoming non-Trainee Program Hosts, Plaintiff's class was given comparable time slots for programming, yet, after she notified her supervisors of her need for surgery and details of her disability, Defendants scheduled Plaintiff in a disparate manner when compared to her peers.

43.     For example, Plaintiff was given more 4 am-7 am shifts than her peers (the least watched hours of the day) and less total airtime than her non-disabled peers.

44.     On or about May 10, 2019, Plaintiff had the highest performing show of the year (in the overnight hours) for the Mally brand, reaching a 90% achievement of her target at the 4 am hour, the least watched hour of the day.

45.     On or about May 19, 2019, again in the overnight hours, Plaintiff hosted an hour of Apple products. Plaintiff was told by the vendor guest that "the team doesn't expect us to make any money. We are only doing this so we have something online." Nonetheless, the hour achieved 80% of the targeted goal, much to the surprise of the producers and the vendor/planning/buying teams.

46.     On or about May 21, 2019, Plaintiff met with Brettmann.

47.     During the meeting, Plaintiff complained to Brettmann that she was not being treated in the same manner as her peers and that she was not being given the same schedule or show opportunities as other new QVC Program Hosts. Plaintiff reminded Brettman of her skills and qualifications in multiple areas, including without limitation, in the beauty area as an

7

experienced beauty and lifestyle expert, television host, former Miss Arizona, and professional makeup artist.

48.     During the same meeting, Plaintiff discussed her upcoming surgery for Endometriosis and information related to same that she had been given by Team Member Services. Plaintiff further told Brettman that she had discussed her surgery with the Programming Department within Defendants' organization.

49.     In response, Brettmann told Plaintiff to schedule a meeting with Mallon in Programming and ask for "feedback" and "opportunities" to grow.

50.     Plaintiff believed that she was singled out for "feedback" after she disclosed her disability.

51.     Despite Plaintiff's requests to be given opportunities equal to the other new QVC Program Hosts, Plaintiff continued to be given fewer opportunities even though she performed well to Defendants' objective criteria.

52.     In or about July 2019, Plaintiff was given a partially successful performance rating for the two prior quarters.

53.     Plaintiff's "partially successful" rating was unwarranted and not consistent with her performance to objective metrics.

54.     At the same time Plaintiff was successfully performing her hosting duties, she worked diligently with Defendants' digital area and other departments, including in connection with leveraging her own social media following. For example, and without limitation, Plaintiff created a "getaway guide" series in relationship to upcoming travel to Europe and other trips, integrating and promoting approximately twelve (12) QVC products to Defendants' benefit.

55.     On or about August 9, 2019, Plaintiff contacted Team Member services to receive additional details about leave related to her surgery.

56.     On or about August 20, 2019, Plaintiff was given a December 30, 2019, surgery date with post-operative appointments slated for January 2020.

57.     Plaintiff informed Brettmann of the date for her surgery.

58.     Brettmann encouraged Plaintiff to move the date of her surgery.

59.     Plaintiff shifted her surgery to December 3, 2019, and told Respondents that her last day of work before medical leave would be November 26, 2019, to allow for pre-operative appointments.

60.     Brettmann told Plaintiff that she should not tell Schick about her surgery and that Brettmann would "handle" it.

61.     On or about September 9, 2019, Plaintiff sent an email to Brettman reminding her of her surgery and related medical leave schedule.

62.     Brettmann confirmed to Plaintiff that she told Schick about Plaintiff's medical condition and need for surgery.

63.     Plaintiff asked Brettmann how Schick had responded and Brettmann responded, in part, that Schick was "all about the business."

64.     In or about October 2019, Brettmann told Plaintiff that she needed to "work harder than everybody else." Brettmann also told Plaintiff, "I don't know why that is" . . . but, "that's the way it is."

65.     Plaintiff understood Brettmann to be relaying information she had received from people above her within the organization, including Schick.

9

66.    At or around the same time, during a conversation with Roe, Plaintiff expressed her concern that her disability and need for medical leave would result in her termination before her surgery and that she would lose the medical insurance she was relying upon to pay for her surgery.

67.    Roe responded, in sum, that in her opinion Defendants would not terminate Plaintiff before her surgery but would be more likely to terminate her after her return and because of her disability.

68.    Plaintiff reported her conversation with Roe to Brettmann and complained that she was afraid that Defendants would hold her need for surgery and medical leave against her.

69.    Brettmann denied that Defendants would do so.

70.    Plaintiff continued to meet or exceed Defendants' objective performance criteria.

71.    For the month of October, as Defendants' programming entered the busiest time of the year, Plaintiff was assigned the lowest amount of on-air or live shows of any of the approximately thirty-three (33) Program Hosts.

72.    On or about October 24, 2019, Plaintiff was removed entirely from live shows.

73.    Newer, non-disabled QVC hosts were given opportunities to appear on air that Plaintiff was not given.

74.    With the support of others, including without limitation, line producers, Plaintiff continued to try to become involved in holiday related programming.

75.    Respondents blocked Plaintiff's efforts to appear on air.

76.    At the same time, Plaintiff embraced a lesser role with Defendants' digital strategy, working diligently to continue to promote the QVC brand and its products.

77.   On or about November 26, 2019, Plaintiff took medical leave for her surgery for Endometriosis and related recovery and follow-up care.

78.   Plaintiff's medical leave was leave covered by the FMLA.

79.   Plaintiff returned from medical leave on or about January 12, 2020.

80.   Prior to her return, Plaintiff advised Defendants that she may require reasonable accommodation(s) for her disability upon her return.

81.   During a January 2020 performance review, Plaintiff was provided with inaccurate information about how she had performed to her targets. Plaintiff asked Defendants to provide her with the numbers/data that they were relying upon in her review, and they said they would follow up.

82.   In the same meeting, Brettmann asked Plaintiff how she was feeling and told her "I won't tell anyone out there, you can tell me, just between you and I [sic]."

83.   In or about February 2020, a long-time vendor of QVC asked Plaintiff how she was being treated after her surgery and related disability. The vendor went on to state that she had heard "horror stories" of how Defendants treat employees with medical conditions.

84.   On or about February 26, 2020, Plaintiff was notified of her termination.

85.   Plaintiff was blind-sided. Prior to disclosing details of her disability and her need for surgery and medical leave, Plaintiff had never been told her job was in jeopardy.

86.   Defendants told Plaintiff the effective day of her termination was March 2, 2020.

87.   On or about March 4, 2020, the four (4) remaining Program Hosts who started with Plaintiff were given substantial grants of equity/options by Defendants.

88.   Plaintiff learned that reaching a one-year anniversary as a non-trainee Program Host was the reason for the grant of equity/options.

11

89.    By timing Plaintiff's effective date of termination to March 2, 2020, Plaintiff was just two (2) days short of reaching the one-year anniversary as a non-trainee Program Host.

90.    Courtney Webb, non-disabled, replaced Plaintiff on the majority of her on-air slots.

91.    To the best of Plaintiff's knowledge, none of the Program Hosts hired to replace her have disclosed a disability to Defendants.

92.    The only reason given for Plaintiff's termination was "performance." When Plaintiff asked human resources for details related to how her "performance" led to her termination, Plaintiff was told "I don't have any details."

93.    The reason given for Plaintiff's termination was false and pre-textual.

94.    Defendants terminated Plaintiff because of her disability and/or need for reasonable accommodations and/or because she required medical leave for treatment of her disability.

95.    During her tenure with Defendants, Plaintiff learned and observed that they treated Program Hosts with medical conditions in a poor manner, placing them in less desirable on-air slots, minimizing their roles in the organization, isolating them within the Program Host team, and otherwise diminishing them.

96.    Plaintiff's disability, including her record of disability and Defendants' regarding her as having a disability, was a motivating and/or determinative factor in connection with Defendants' discriminatory treatment of Plaintiff, including in connection with her termination, without limitation.

97.    At all times material hereto, Plaintiff was able to perform the essential functions of her job with or without a reasonable accommodation.

98.    Plaintiff's requests for leave and/or for reasonable accommodations were motivating and/or determinative factor(s) in Defendants' discriminatory and retaliatory treatment of Plaintiff, including in connection with her termination, without limitation.

99.    Defendants failed to prevent or address the discriminatory and retaliatory conduct referred to herein and further failed to take corrective and remedial measures to make the workplace free of discriminatory and retaliatory conduct.

100.    Defendants retaliated against Plaintiff for taking FMLA leave.

101.    As a direct and proximate result of Defendants' discriminatory and retaliatory conduct, Plaintiff has in the past incurred, and may in the future incur, a loss of earnings and/or earning capacity, loss of benefits, pain and suffering, embarrassment, humiliation, loss of self-esteem, mental anguish, and loss of life's pleasures, the full extent of which is not known at this time.

102.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendants' discriminatory and retaliatory acts unless and until this Court grants the relief requested herein.

103.    No previous application has been made for the relief requested herein.

## COUNT I – ADA

104.    Plaintiff incorporates by reference each of the preceding paragraphs as if each were set forth herein in its entirety.

105.    By committing the foregoing acts of discrimination and retaliation against Plaintiff, Defendants have violated the ADA.

106.    Said violations were done with malice and/or reckless indifference to Plaintiff's protected rights and warrant the imposition of punitive damages.

13

107.   As a direct and proximate result of Defendants' violation of the ADA, Plaintiff has suffered the damages and losses set forth herein and has incurred attorneys' fees and costs.

108.   Plaintiff suffered and may continue to suffer irreparable injury and monetary damages as a result of Defendants' discriminatory and retaliatory acts unless and until this Court grants the relief requested herein.

## COUNT II – FMLA

109.   Plaintiff incorporates by reference each of the preceding paragraphs as if each were set forth herein in its entirety.

110.   By committing the foregoing acts against Plaintiff, Defendants have violated the FMLA.

111.   Defendants' conduct was retaliatory.

112.   Said violations were willful, not in good faith, and Defendants did not have reasonable grounds to believe that the foregoing acts were not in violation of the FMLA.

113.   The imposition of liquidated damages is warranted.

114.   As a direct and proximate result of Defendants' violations of the FMLA, Plaintiff has suffered damages and losses set forth herein and has incurred attorneys' fees and costs.

115.   Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendants' violations of the FMLA unless this Court grants the relief requested herein.

## COUNT III – PHRA

116.   Plaintiff incorporates by reference each of the preceding paragraphs as if each were set forth herein in its entirety.

117. By committing the foregoing acts of discrimination and retaliation against Plaintiff, Defendants have violated the PHRA.

118. Said violations were intentional and willful.

119. As a direct and proximate result of Defendants' violation of the PHRA, Plaintiff has suffered the damages and losses set forth herein and has incurred attorneys' fees and costs.

120. Plaintiff suffered and may continue to suffer irreparable injury and monetary damages as a result of Defendants' discriminatory and retaliatory acts unless and until this Court grants the relief requested herein.

## **COUNT IV – PFPO**

121. Plaintiff incorporates by reference each of the preceding paragraphs as if each were set forth herein in its entirety.

122. By committing the foregoing acts of discrimination and retaliation against Plaintiff, Defendants have violated the PFPO.

123. Said violations were done with malice and/or reckless indifference to Plaintiff's protected rights, and were especially egregious, warranting the imposition of punitive damages.

124. Plaintiff's disability was a substantial, motivating, and/or determinative factor in Defendants' termination of her employment.

125. As a direct and proximate result of Defendants' violation of the PFPO, Plaintiff has suffered the damages and losses set forth herein and has incurred attorneys' fees and costs.

126. Plaintiff suffered and may continue to suffer irreparable injury and monetary damages as a result of Defendants' discriminatory and retaliatory acts unless and until this Court grants the relief requested herein.

## **RELIEF**

WHEREFORE, Plaintiff seeks damages and legal and equitable relief in connection with Defendants' improper conduct, and specifically prays that the Court grant the following relief to Plaintiff by:

a.     Declaring the acts and practices complained of herein to be in violation of the ADA;

b.     Declaring the acts and practices complained of herein to be in violation of the FMLA;

c.     Declaring the acts and practices complained of herein to be in violation of the PHRA;

d.     Declaring the acts and practices complained of herein to be in violation of the PFPO;

e.     Enjoining and permanently restraining the violations alleged herein;

f.     Entering judgment against Defendants and in favor of Plaintiff in an amount to be determined;

g.     Awarding compensatory damages to make Plaintiff whole for all lost earnings, earning capacity, and benefits, which Plaintiff has suffered as a result of Defendants' improper conduct;

h.     Awarding compensatory damages to Plaintiff for past pain and suffering, emotional upset, mental anguish, humiliation, and loss of life's pleasures, which Plaintiff has suffered as a result of Defendants' improper conduct;

i.     Awarding liquidated damages to Plaintiff;

j.     Awarding punitive damages to Plaintiff;

16

k.      Awarding Plaintiff other such damages as are appropriate under the ADA, the

FMLA, the PHRA, the PFPO

l.      Awarding Plaintiff the costs of suit, expert fees and other disbursements, and

reasonable attorneys' fees; and

m.      Granting such other and further relief as this Court may deem just, proper, or

equitable including other equitable and injunctive relief providing restitution for past

violations and preventing future violations.


                          **CONSOLE MATTIACI LAW LLC**

Dated: September 3, 2021                By:     */s/ Katherine C. Oeltjen*_____
                                                Katherine C. Oeltjen, Esquire (318037)
                                                Stephen G. Console, Esquire (36656)
                                                1525 Locust Street, 9th Floor
                                                Philadelphia, PA 19102
                                                (215) 545-7676
                                                (215) 565-2852 (fax)
                                                *Attorneys for Plaintiff*

17

# Exhibit "1"

COMMONWEALTH OF PENNSYLVANIA
GOVERNOR'S OFFICE
PENNSYLVANIA HUMAN RELATIONS COMMISSION

<u>COMPLAINT</u>

COMPLAINANT :                                          :
                                                      :
RACHELLE   DRISCOLL                                    :              Docket No.
                                                      :
v.                                                    :
                                                      :
RESPONDENTS :                                          :
                                                      :
QURATE RETAIL, INC.                                   :
                                                      :
AND                                                  :
                                                      :
QVC, INC.                                            :

1.  The Complainant herein is:

    Name:        <u>Rachelle Driscoll</u>

    Address:     redacted ████████████████

2.  The Respondents herein are:

    Names:       <u>Qurate Retail, Inc.</u>

    Address:     1200 Wilson Drive
                 West Chester, PA 19380

                 <u>QVC, Inc.</u>

                 1200 Wilson Drive
                 West Chester, PA 19380

3.  I, <u>Rachelle Driscoll</u>, the Complainant herein, allege that I was subjected to unlawful

discrimination because of my disability (including history of and regarded as) as set forth below.

A.  I specifically allege:

[1]      I was hired by Respondents on or about September 4, 2018 as a Program Host (Trainee) for Respondents' QVC home shopping network and across QVC's other platforms, including without limitation, digital.

[2]      Program Hosts appear on camera, during live programming and are responsible for informing the audience about the attributes and benefits of each product featured such that viewers are inspired to make purchases, and therefore generate revenue for Respondents.

[3]      At all times material hereto, I performed my job in an exemplary manner, consistently taking on job duties that were not required of me in order to ensure Respondents' success. By way of example, and without limitation, this included extensive work with Respondents' digital department(s) to coordinate social media and digital strategy with the promotion of Respondents' products.

[4]      I was initially hired for a six-month probationary period after successfully competing in a national host search with more than seventeen thousand (17,000) applicants.

[5]      During the early weeks and months of my employment, I participated in intensive training program and mentoring with senior QVC host Mary Beth Roe ("Roe).

[6]      My goal during the six-month probationary period was to ensure that I became a long-term QVC program host. Respondents made it very clear to the six individuals offered probationary employment that being asked to remain after the six months was not guaranteed.

[7]      During my training, I told Roe that I suffered from an autoimmune disease. Roe told me that I should inform "management" of Respondents.

[8]     Fearing that my disclosure of a disability would prevent Respondents from retaining me, I did not disclose my autoimmune disease. I did not require any accommodations as a result of my autoimmune disease at that time and was able to perform the essential functions of my job.

[9]     Between September, 2018 and in or about January, 2019, I participated in training and development with my peers. In or about January, 2019 I began to work on air with a co-Program Host, per Respondents' standard practices.

[10]     On or about February, 24, 2019, I informed Zahra Farrokh, Programming, that I would be flying home to Arizona for a surgical appointment and shared my belief that I would I would possibly need to have surgery at a later date for a medical condition.

[11]     I have Endometriosis. Endometriosis is a chronic medical condition in which tissue similar to that found in the lining of the uterus grows outside of the uterus and typically within the abdominal cavity. Endometriosis can result in a myriad of symptoms including without limitation, extreme pain and other symptoms that substantially impact day to day living.

[12]     On or about March 4, 2019 I was offered a three-year contract with Respondents amid my exemplary performance, becoming a Program Host (i.e. no Trainee status) along with others in my probationary class.

[13]     To the best of my information and belief, I was the only disabled Program Host in my probationary class and thus the only disabled Program Host offered a non-probationary position.

[14]     Upon becoming a Program Host, I reported to Caroline Stueck ("Stueck"), Director of Talent.

[15]     To the best of my knowledge, Stueck is non-disabled.

[16]     Approximately one month later, my supervisor changed to Beverly Brettmann ("Brettman"), Director of Talent.

[17]     To the best of my knowledge, Brettman is non-disabled.

[18]     On or about April 2nd, I told Shannon Mallon, ("Mallon") Head Of Programming, that I needed surgery for Endometriosis.

[19]     Shortly thereafter, Brettman, Director of Talent, told me "they" don't "get you." I understood "they" to refer to upper management and those within Respondent's programming division. I understood the statement to be negative as other hosts had been terminated or given poor on-air time slots when "they" "didn't get" them.

[20]     I had never been told that management "didn't get me" before I confirmed that I needed surgery for my disability.

[21]     On or about April 29, 2019, I telephoned Team Member Services to get information about medical leave for surgery. Team Member Services opened a "case" on my behalf and provided me with information about medical leave.

[22]     Initially, upon becoming non-Trainee Program Hosts, my class was given comparable time slots for programming, yet, after I notified Respondents of my need for surgery and the nature of my disability, Respondents scheduled me in a disparate manner when compared to my peers. I was given more 4-7 am shifts than my peers (the least watched hours of the day) and less total airtime than my non-disabled peers.

[23]     On or about May 10, 2019, I had the highest performing show of the year (in the overnight hours) for the Mally brand, reaching a 90% achievement of my target at the 4 am hour, the least watched hour of the day.

[24]     On or about May 19, 2019, again in the overnight hours, I hosted an hour of Apple products. I was told by the vendor guest that "the team doesn't expect us to make any money.  We are only doing this so we have something online."  Nonetheless, the hour achieved 80% of the targeted goal much to the surprise of the producers and the vendor/planning/buying teams.

[25]     On or about May 21, 2019 I met with Brettmann as part of our regular monthly routine.  During the meeting I complained to Brettmann that I was not being treated in the same manner as my peers and that I was not being given the same schedule or show opportunities as other new QVC Program Hosts. I reminded Brettman of my skills and qualifications in multiple areas, including without limitation, in the beauty area as a professional make up artist.

[26]     During the same meeting, I discussed my upcoming surgery for Endometriosis and information related to same that I had been given by Team Member Services. I further told Brettman that I had discussed my surgery with programming within Respondents' organization.

[27]     In response, Brettmann told me to schedule a meeting with Mallon in Programming and ask for "feedback" and "opportunities" to grow.

[28]     I believe that I was singled out for "feedback" after I disclosed my disability.

[29]     Despite my requests to be given opportunities equal to the other new QVC Program Hosts, I continued to be given fewer opportunities despite the fact that I performed well to Respondents' objective criteria.

[30]     Nonetheless, in or about July, 2019, I was given a partially successful performance rating for the two prior quarters.

[31]     At the same time as I was successfully performing my hosting duties, I worked diligently with Respondents' digital area and other departments, seeking to integrate my social media presence and the thousands of followers that I had before I joined Respondents, with Respondent's products and promotions.  For example, and without limitation, I created a "getaway guide" series in relationship to upcoming travel to Europe and other trips, integrating and promoting approximately twelve (12) QVC products.

[32]     On or about August 9, 2019, I contacted Team Member services to receive additional details about leave related to my surgery.

[33]     On or about August 20, 2019, I was given a December 30, 2019 surgery date with post-operative appointments slated for January, 2020.

[34]     At or around this time, I informed Brettman of the date for my surgery.

[35]     At Brettman's urging, I shifted my surgery to December 3, 2019 and told Respondents that my last day worked before medical leave would be November 26, 2019 to allow for pre-operative appointments.

[36]     On or about September 9, 2019, I sent an email to Brettman reminding her of my surgery and related medical leave schedule. She responded by telling me she had informed her supervisor, Sue Schick ("Schick"), Vice President of Talent, of my surgery and leave. Brettman had earlier told me that I should not tell Schick of my disability and need for surgery and that she would handle it. When I asked Brettman how Schick responded, Brettman commented in part, that Schick was "all about the business."

[37]     In or about October, 2019, I was told that I needed to "work harder than everybody else" by Brettman. She further stated, "I don't know why that is"…..but, "that's the way it is."  I understood Brettman to be relaying information she had received from people above her within the organization, including Schick.

[38]     Also in or about October, 2019, during a conversation with Roe I expressed my concern that my disability and need for medical leave would result in my termination before my surgery and that I would lose the medical insurance I was relying upon to pay for my surgery.

[39]     I continued to meet or exceed Respondents' objective performance criteria.

[40]     For the month of October, as Respondents programming entered the busiest time of the year, I was assigned the lowest amount of on-air or live shows of any of the approximately thirty-three (33) Program Hosts (including long-standing veterans and hosts who joined the organization at the same time that I did).

[41]     On or about October 24, 2019, I was removed entirely from live shows.

[42]     Newer, non-disabled QVC hosts were given opportunities to appear on air that I was not given.

[43]     With the support of others, including without limitation, line producers, I continued to try to become involved in holiday related programming.

[44]     Respondents blocked my efforts to appear on air.

[45]     At the same time, I embraced a lesser role with Respondents digital strategy, working diligently to continue to promote the QVC brand and its products.

[46]     On or about November 26, 2019, I took medical leave for my surgery for Endometriosis and related recovery and follow-up care.

[47]     I returned from medical leave on or about January 12, 2020.

[48]     Prior to my return, I advised Respondents that I might have required a reasonable accommodation upon my return.

[49]     During a January, 2020 performance review I was provided with inaccurate information about how I performed to my targets. I asked Respondents to provide me with the numbers/data that they were relying upon in my review and they said they would follow up. In the same meeting, Brettman asked me how I was feeling and told me "I won't tell anyone out there, you can tell me, just between you and I [sic]."

[50]     In or about February, 2020, a long-time vendor of QVC asked me how I was being treated after my surgery and related disability. The vendor went on to state that she had heard "horror stories" of how Respondents treat employees with medical conditions.

[51]     On or about February 26, 2020, I was notified of my termination. I was blind-sided. Prior to disclosing my disability and need for surgery, there was no indication that my job was in jeopardy.

[52]     Courtney Webb, non-disabled, replaced me on the majority of my on-air slots. In addition, to the best of my knowledge, Respondents hired three new female Program Hosts to begin work in April, 2020.

[53]     To the best of my knowledge none of the Program Hosts hired to replace me have disclosed a disability to Respondents.

[54]     The only reason given for my termination was "performance." When I asked human resources for details related to how my "performance" lead to my termination, I was told "I don't have any details."

[55]     The reason given for my termination was false and pre-textual.

[56]     Respondents terminated me because of my disability and/or need for reasonable accommodations and/or because I required medical leave for treatment of my disability.

[57]     During my tenure with Respondents, I learned and observed that they treated Program Hosts with disabilities in a poor manner, placing them in less desirable on-air slots, minimizing their role in the building, isolating them within the Program Host team and otherwise diminishing their roles.

[58]     Based on the aforementioned, I allege that Respondents have discriminated against me because of my disability (including history of and regarded as) in violation of  the Americans with Disabilities Act, as amended, 42 U.S.C. §12101, *et seq.,* the Pennsylvania Human Relations Act, as amended, 43 P.S. § 951, *et seq.* ("PHRA"), and the Philadelphia Fair Practices Ordinance, Phila. Code § 9-1101, *et seq.* ("PFPO").

4.     The allegations in Paragraph 3 hereof constitute unlawful discriminatory and retaliatory practices in violation of:

  X      Pennsylvania Human Relations Act (Act of October 27, 1955, P.L. 744, as amended) Section 5 Subsection(s):   (a); (d)

____     Section 5.1 Subsection(s) _____

____     Section 5.2 Subsection(s) _____

____     Pennsylvania Fair Educational Opportunities Act (Act of July 17, 1961, P.L. 766, as amended) Section 4 Subsection(s) _____

5.     Other action based upon the aforesaid allegations has been instituted by the Complainant in any court or before any other commission within the Commonwealth of Pennsylvania as follows:

  X        This charge will be referred to the EEOC for the purpose of dual filing.

6.    The Complainant seeks that Respondents be required to:

(a) Make the Complainant whole.

(b) Eliminate all unlawful discriminatory and retaliatory practice(s) and procedure(s).

(c) Remedy the discriminatory and retaliatory effect of past practice(s) and procedure(s).

(d) Take further affirmative action necessary and appropriate to remedy the violation complained of herein.

(e) Provide such further relief as the Commission deems necessary and appropriate.

## VERIFICATION

I hereby verify that the statements contained in this complaint are true and correct to the best of my knowledge, information, and belief. I understand that false statements herein are made subject to the penalties of 18 P.A.C.A. Section 4904, relating to unsworn falsification to authorities.

_4/6/2020_
(Date Signed)

_____
(Signature)

# Exhibit "2"

EEOC Form 161-B (11/2020)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

To:  **Rachelle Driscoll**
REDACTED

From:  **Philadelphia District Office
801 Market Street
Suite 1000
Philadelphia, PA 19107**

| | *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))* |

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 17F-2021-60044 | Damon A. Johnson, State, Local &Tribal Program Manager | (267) 589-9722 |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

[X]  More than 180 days have passed since the filing of this charge.

[ ]  Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

[X]  The EEOC is terminating its processing of this charge.

[ ]  The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

[ ]  The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this Notice.** Otherwise, your right to sue based on the above-numbered charge will be lost.

[ ]  The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Enclosures(s)

*Dana R Hutter* (signature)

**Dana R. Hutter,
Deputy Director**

June 9, 2021
*(Date Issued)*

cc:     **For Respondent:
Linda Dwoskin, Esq.
Dechert LLP
Via email: linda.dwoskin@dechert.com**

**For Charging Party:
Katherine C. Oeltjen, Esq.
Console Mattiacci Law
Via email: oeltjen@consolelaw.com**

Enclosure with EEOC
Form 161-B (11/2020)

## INFORMATION RELATED TO FILING SUIT UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law. If you also plan to sue claiming violations of State law, please be aware that time limits and other provisions of State law may be shorter or more limited than those described below.)*

### PRIVATE SUIT RIGHTS -- **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days of the date you *receive* this Notice**. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope or record of receipt, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *issued* to you** (as indicated where the Notice is signed) or the date of the postmark or record of receipt, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

### PRIVATE SUIT RIGHTS -- **Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice and within the 2- or 3-year EPA back pay recovery period.

### ATTORNEY REPRESENTATION -- **Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

### ATTORNEY REFERRAL AND EEOC ASSISTANCE -- **All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months of this Notice**. (Before filing suit, any request should be made within the next 90 days.)

***IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.***

**NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA):** The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.

**"Actual" disability or a "record of" a disability (note: if you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability):**

➢ **The limitations from the impairment no longer have to be severe or significant** for the impairment to be considered substantially limiting.
➢ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.
➢ **Only one** major life activity need be substantially limited.
➢ With the exception of ordinary eyeglasses or contact lenses, **the beneficial effects of "mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.
➢ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or "in remission" (e.g., cancer) is a disability if it **would be substantially limiting when active**.
➢ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

**"Regarded as" coverage:**

➢ An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).
➢ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.
➢ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively *BOTH* transitory (lasting or expected to last six months or less) *AND* minor.
➢ A person is not able to bring a failure to accommodate claim *if* the individual is covered only under the "regarded as" definition of "disability."

*Note: Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability.* For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.